**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:19-cr-0093-RFB-EJY |
| Plaintiff, | **ORDER** |
| v. | |
| RANDY CARTER, | |
| Defendant. | |

## I.      INTRODUCTION

Before the Court is Mr. Carter's Motion to Suppress [ECF No. 26].  The Court held an evidentiary hearing on this Motion.  For the reasons stated below, the Court grants the Motion to Suppress.

## II.      FACTUAL FINDINGS

The Court makes the following factual findings based upon consideration of all of the evidence submitted at the evidentiary hearing in this case.

On December 28, 2018 Officer Evan Kallas of the Las Vegas Metropolitan Police Department ("Metro") Gang Enforcement Unit was driving in a marked police vehicle with Detective Dalrymple of Metro's Intelligence Unit. The Gang Unit engages in proactive policing tactics. This includes randomly checking license plates in certain neighborhoods in Las Vegas. Kallas was equipped with a body camera but Dalrymple was not.

On December 28, 2018 around 8:22 p.m., Kallas was driving behind a car being driven by the Defendant, Randy Carter. Kallas checked the license plates on Carter's vehicle and discovered that the registration for this vehicle had been suspended. Upon discovering the suspended

registration, Kallas conducted a traffic stop of Carter's vehicle with his traffic lights. Carter pulled his vehicle into the parking lot of an apartment complex located near the intersection of Paradise and Twain Avenues in Las Vegas. Kallas requested assistance from other gang unit officers as he was conducting the stop of Carter. Kallas pulled his vehicle directly behind Carter's vehicle to block Carter from being able to drive away. Kallas was driving and exited his vehicle from the driver's side. He approached Carter's vehicle on the driver's side. Kallas' body camera had activated inside of the car when he started his check of Carter's vehicle's registration and it continued to record as he approached the driver's side of Carter's vehicle. As Kallas approached the vehicle, he yelled at Carter to roll down his windows. Carter rolled down the driver side and passenger side front windows. Kallas and Darymple had their flashlights out and were shining them into the car.

Upon reaching the side of the driver's door, Kallas then told Carter that he had been pulled over Carter because the license plates on Carter's car were suspended. He asked Carter if he had ever had his registration suspended. Carter explained that he had current insurance. He said that he had recently checked on his registration by going to the Nevada Department of Motor Vehicles ("DMV") and had been told at the DMV that his registration was fine. Kallas then asked Carter if he had any weapons or drugs in the car and Carter said no. Kallas directed Carter to provide his registration, insurance, and driver's license. Carter complied. Kallas then proceeded to ask Carter a series of questions that were unrelated to the traffic stop. He asked Carter if he had ever been arrested in Las Vegas. Carter indicated he had been arrested previously. Kallas asked him the basis for the arrest. Carter indicated that he was arrested for grand larceny and unlawful possession of a firearm. Kallas then asked Carter if he was a felon and Carter said yes. Kallas then asked Carter "what happened" and why he went to prison. Carter explained his prior criminal history. This additional unrelated questioning lasted for about a minute. Carter did not engage in any conduct that would suggest or indicate that he was a threat to the safety of the officers. Kallas did not order Carter to exit the vehicle and did not see any need to do so. Kallas did not find Carter to present a risk of harm to the officers at the stop.

Kallas then walked back to his car with Carter's identification documents. By the time that Kallas reached the front of his car he was met by Officer Julien Pappas from the Gang Unit. Pappas had responded to Kallas' request for assistance and had arrived in a separate police car just as Kallas was finishing his initial conversation with Carter. When Kallas walked back to his car with Carter's items he started to talk with Pappas. He deactivated his body camera for this conversation.

After Kallas deactivated his camera, he and Pappas discussed the basis for the traffic stop. Kallas did not communicate any information to suggest that Carter had engaged in any conduct that was a threat to the safety of the officers. He did not indicate to Pappas that Carter had consented to a search of his car. Pappas then approached Carter's car and began talking with him. He did not activate his body camera during his conversation with Carter. His failure to activate his body camera was a violation of Metro's policy on body camera use and the recording of interactions with suspects, the public or individuals subject to an investigatory detention. At some point after this conversation began, Pappas ordered Carter out of the vehicle. He directed Carter to stand in front of Kallas' car. He then began to search Carter's vehicle. During the search of the vehicle Pappas found a foil containing methamphetamine and a pipe that appeared to be the type of pipe used to smoke illegal drugs. He found these items in a cigarette box in the driver side door. Pappas then activated his body camera. Upon discovering the drugs and the pipe, he requested that Kallas come to view the items which he had discovered.

After seeing the pipe, Kallas walked back to where Carter was standing in front of his car. Carter was facing the inside of Kallas' car. Pappas then continued to search the car. His body camera was activated as he continued to search the vehicle. He then turned his body camera off. He then turned it back on again. As he continued to search, he opened the trunk of Carter's car. Inside of the trunk, he found a large duffel bag. He could not see inside of the bag. He then opened the bag and found what appeared to be a gun. He then walked back to the side of Kallas' vehicle and told the officers he found what he believed was a firearm, but he requested that they come view the firearm to determine if it was real. The officers walked over to the trunk and began talking around the trunk. Pappas then turned off his body camera again as he was looking down into the trunk of Carter's vehicle.

At some point after the firearm was found, the officers froze the scene and requested a telephonic warrant. Kallas was the person who called the state court judge to provide the sworn facts to support the issuance of a search warrant for the vehicle. Kallas spoke to Pappas about the details of the stop before seeking the warrant. This telephone warrant was authorized by a state court judge.

At some point after the firearm was discovered in the trunk and after more than 25 minutes after the initial stop, Pappas turned his camera back on and approached Carter. Carter had already been placed in custody and was in handcuffs standing at the front of Kallas' car. During the conversation that ensued, Pappas asks Carter about an earlier conversation and a "pipe" in the car. Carter acknowledged that the pipe was his pipe. Prior to this post-custodial conversation, there is no recorded body camera footage of Carter consenting to a search of his car. There is no body camera footage prior Carter's arrest in which he volunteers that he had a drug or a pipe in the car. Indeed, in the recorded body camera footage, in response to Kallas' question about any drugs in the vehicle Carter said there were no drugs or weapons in the vehicle.

## III.   LEGAL STANDARD

As an exception to the warrant requirement of the Fourth Amendment to the United States Constitution, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime. United States v. Brooks, 610 F.3d 1186, 1193 (9th Cir. 2010)(internal citations omitted). "Probable cause to search is evaluated in light of the totality of the circumstances." United States v. Pinela-Hernandez, 262 F.3d 974, 978 (9th Cir. 2001).

Additionally, "because warrantless searches and seizures are per se unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement." United States v. Cervantes, 678 F.3d 798, 804 (9th Cir. 2012)(internal citations omitted).

Furthermore, it has long been established that consent to a warrantless search and seizure must be "unequivocal and specific and freely and intelligently given. There must be convincing

evidence that [a] defendant has waived his rights. There must be clear and positive testimony." United States v. Shaibu, 920 F.2d 1423, 1426 (9th Cir. 1990)(internal citations omitted).

## IV.   DISCUSSION

The Court finds that the officers in this case a.) did not obtain consent to search the vehicle and b.) did not have probable cause to search the vehicle. The search of the vehicle was therefore unlawful, and the results of the search must therefore be suppressed.

### A.  Consent To Search

The Court finds that the government has not met its burden of establishing by credible evidence that Carter consented to a search of his vehicle.

The government has relied upon the testimony of Officer Pappas to argue that Carter consented to a search of his vehicle. No one else heard this alleged consent or was present when it was obtained. There is no body camera footage of the consent. Indeed, there is no body camera footage of Pappas' conversation with Carter about the alleged consent or pipe before the search of the vehicle. Department policy requires such conversations be recorded. Officer Pappas explanation for this failure was unconvincing and his memory when he testified was foggy. The seemingly strategic activation and deactivation of the body camera by Officer Pappas in violation of department policy as well as his unconvincing and less than credible testimony simply cannot establish that he obtained consent to search from Carter prior to beginning his search of the vehicle and prior to finding the drugs, pipe and firearm in the car.[1] While the government seeks to point to other documents to establish that the consent was validly obtained before the search, such documentation was all created well after the search and also relied upon Pappas. On this record, the government cannot meet its burden of establishing that a valid consent to search was obtained from Carter prior to the search of his vehicle.

---

[1] In referencing Metro's policy regarding body camera usage here, the Court is focused on Pappas' interaction with Carter and not his conversations with other officers. The Court finds that the policy could be different for these different types of interactions and so the Court is basing its findings upon Pappas' failures as to Metro policy regarding interviews of drivers or detainees at a traffic stop. A violation of policy which was admitted by Pappas.

**B.  Probable Cause**

The Court also finds that the government cannot establish that the officers had probable cause to search the vehicle before finding the drugs and firearm in the car.

The Court finds that Pappas began a search of the Carter's vehicle without consent and without probable cause. At the time of the search, Carter had not exhibited any behavior to suggest that he had committed, was committing, or would commit a crime. None of the officers observed in plain view of the vehicle any evidence or contraband which would establish probable cause to search the vehicle.

The government again seeks to rely upon the incredible testimony of Officer Pappas, who testified that Carter had admitted to having a "pipe" in response to a question about whether or not there were drugs in the vehicle. Consistent with its prior finding regarding the alleged consent, the Court finds that Pappas' less than credible testimony cannot establish that Carter made the statement about the "pipe" prior to the search being initiated. Moreover, Pappas, as previously noted, did not record his conversation with his body camera with Carter as required by Metro policy. His explanation for failing to record this conversation was unconvincing. His recollection of the details of this alleged conversation was imprecise and halting. Additionally, in the only *recorded* statement by Carter in response to Kallas' question about drugs in the vehicle, Carter denied that there were drugs in the car. On this record, the Court finds that the government has not established that probable cause existed to search Carter's vehicle.

The Court does not find that Carter's statements after he is in custody establish probable cause prior to the search beginning. It is undisputed that Carter does make reference to a "pipe" in a conversation with Pappas <u>after</u> he has been arrested and handcuffed and is standing in front of Kallas' patrol vehicle.[2] However, Pappas' post-custodial leading question to Carter about the pipe which prompted Carter's response cannot be substituted for the statements allegedly made prior to

---

[2] As the Court has found that no consent was provided to the officers prior to the search, it is not necessary to address the issue of voluntariness of any consent. Nonetheless, to the extent that any statements by Carter (even post-arrest) could be construed as consent, the Court further finds that the government cannot meet its burden to establish that any consent that was given was voluntary. As the circumstances surrounding the voluntariness of the consent would depend primarily upon the testimony of Pappas and the Court has found his testimony not to be credible, it necessarily follows that the government cannot meet its burden to establish facts supporting the voluntariness of any consent. <u>United States v. Brown</u>, 563 F.3d 410, 414-16 (9th Cir. 2009)(internal citations omitted).

the search. The "totality of the circumstances" of statements allegedly made prior to a search are essential to a court's inquiry into the existence of probable cause before the search began. Pinela-Hernandez, 262 F.3d at 978. The government has the burden of establishing probable cause for a warrantless search. In this case, the Court has serious questions about the nature and content of the interaction between Carter and officers that is not recorded by body camera footage. Given the suspicious behavior of the officers during the stop and the testimony at the hearing, the Court finds that any statements made by Carter post-arrest simply cannot be taken at face value. The Court finds that the government cannot credibly establish facts sufficient to for the Court to find that Carter made statements or admissions to Pappas that created probable cause to search.

### C. Good Faith Exception

Given the Court's findings as to the officers' conduct during the stop, the Court does not find that the good-faith exception should apply in this case. United States v. Leon, 468 U.S. 897, 913 (1984). The Court first notes that the contraband which forms the basis for this case was found prior to the search warrant being issued. Second, the search warrant was obtained in reliance upon alleged statements or admissions that the Court has found not to be established by credible evidence. Third, the warrant was also obtained in reliance in part on evidence—the methamphetamine and firearm—which the Court has found to have been the product of an illegal search. Finally, the Court does not find that Kallas was unaware of the non-policy and suspect actions of Pappas. It would therefore be anathema to the basic notion of a good-faith exception for it to apply to circumstances in which the Court has found that the officers have not acted or testified in good faith. The Court, thus, does not find that the good-faith exception applies to the search in this case.

/ / /

/ / /

/ / /

1

**V.      CONCLUSION**

2

    **IT IS HEREBY ORDERED** that the Motion to Suppress [ECF No. 26] is GRANTED.

3

4

    **DATED:** <u>February 23, 2021</u>.

5

                                              _____

6

                                              **RICHARD F. BOULWARE, II**

                                              **UNITED STATES DISTRICT JUDGE**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28